Lessee of Thomas Sturgeon *against* Alexander Waugh. ·

Ex parte depositions are no evidence to establish an independent title, but may be read
to establish mere boundary, or by way of corroboration of testimony.
Limitation act bars a recovery on an improvement, where there has not been a posses-
sion for seven years before the bringing of the action though there has been a deci-
sion of the Board of Property to survey the land for the improver, no steps having
been taken to get the lands surveyed. An abandond improvement gives no claim.

Ejecment for 214 acres of land in Lower Paxtang township.
The quantity in dispute was 46 acres only.

It appeared in evidence, that Samuel Sturgeon, the father of the
lessor of the plaintiff, in August 1742, brought an improvement
from James Mitcheltree for 5*l*.

He afterwards agreed, that his brother Jeremiah Sturgeon, un-
der whom the defendant held, should have one moiety of the land,
and he paid his proportion of the purchase. Both settled on the
tract, and further improved and cultivated the same, Samuel hold-
ing the east, and Jeremiah the west end thereof. A partition fence
run between them, which was continued by a range of stakes, and
was shown by them, as their boundary, to some of the neighbours.
Samuel cleared and occupied a field of about ten acres, and a small
piece of meadow of about three quarters of an acre, (which were
part of the lands in controversy) up to the division fence, without in-
terruption, for several years, and died in 1749, having devised all
his real and personal estate to his son, the lessor of the plaintiff,
paying certain legacies. Within the period of three years after, the
uncle and nephew began to dispute about their boundary line, and
neighbours were called in to adjust their differences, but without
success.

On the 10th November 1752, Thomas took out a warrant for
200 acres, adjoining William Bell and William Chambers, interest
to commence from the time of settlement; and on the 22d March
1753, Jeremiah took out a warrant for 200 acres adjoining the said
Bell and Robert Montgomery. These warrants were executed
together by William Galbreath the deputy surveyor on the 9th
April 1754, who surveyed 218 acres and allowance, under the form-
er, and 219 acres and allowance under the latter, including the lands
in question. One of the sons of Jeremiah, who was present at this
survey, swore, that it was agreed between his father and cousin at
that time, that a lane before made between the two tracts, and
which had since continued on the same spot for fifty years, should
divide the two farms, and that his father was not desirous at first to
have an allotment of the old field. A contest arose soon afterwards
about the meadow, and Thomas attempted to take forcible posses-
sion thereof, but was prevented. An affray ensued, which termi-
nated in a law suit, in which Jeremiah was successful.

On the 2d March 1658, Thomas entered a *caveat* against the acceptance of Jeremiah's survey, and on the 15th April following, Richard Peters the secretary of the land office, on the perusal of some depositions, wrote a letter to Nicholas Scull, the surveyor general, to survey the land agreeably to the old consentable line. On the 12th January 1759, both those officers confirmed the first decision of the secretary ; but it did not appear, that any survey had been made in pursuance thereof, or that any application had been for that purpose. If it had been effectuated, the result would have been, that Thomas would have acquired 264 acres, including the land in question, and Jeremiah 173 acres.

Each of the parties notwithstanding this, occupied the lands up to the lane, and worked their respective parts without interruption, until the 6th April 1765, when Thomas Sturgeon conveyed his 218, acres to John and Christian Brandt in consideration of 700*l* adjoining Jeremiah Sturgeon on the west, according to the lines shown in the presence of John Leider and Peter Corbet, (the words of the deed ; ) and Thomas hereupon removed to another farm ten miles distant, and continued there thirty years, without laying any claim to the lands in dispute. He then went to Juniata.

Jeremiah Sturgeon died in 1793, and the defendant held as a tenant under John M'Donald, who purchased the lands at public vendue from his executors, duly empowered to sell and convey the same by his will. The present ejectment was brought to June term 1795.

A question arose on the trial, respecting the reading of two *ex parte* depositions tending to show the improvements of the two brothers, their declarations at different times, and the reputation of the neighborhood, as to the fence being the original division line between them : and the case of Montgomery's lessee *v.* Dickey, at Chambersburgh, April assizes 1797, was cited and relied on by the plaintiff's counsel.

By the court. In England, heresay and reputation are eviden~ ~ of boundary from the necessity of the case, (2 Term Rep. 55. 1 Ld. Ray. 311) where there is no ancient terrier or map. Such evidence has also been received in Pennsylvania, though the same necessity does not subsist here in ordinary cases. But *ex parte* depositions cannot be read in evidence to establish an independent title, as that one claimed under an improvement. They may also be received by way of corroboration of other testimony which has been given in the cause. Restricted and used for those purposes the two depositions may be read.

After full argument by counsel on the testimony being closed, the court observed to the jury, that matters of facts as well as of law came before them for decision. As to the former it seemed necessary to determine, whether the fence was the originally agreed line between the two brothers, and whether it was changed to the lane at the time of the survey by the consent ef the uncle and nephew. On the latter point, exclusive of the direct testimony given, the peaceable possession of Jeremiah, and the total silence and inactiveity of Thomas from 1759, until the commencement of the ejectment, were violent presumptions of right in the former, and of an acquiescence in the latter. Co. Lit. 6. *b*. So was the conveyance to the two Brandts ; for though the language of the deed may be deemed the act of the scrivener in the first instance, yet by the execution of it, Thomas has adopted it as his own. The probability was, that if the fence was first fixed on as the division line, it was contemplated that an equal partition would be effected thereby ; and it is obvious, that if afterwards the boundary was changed to the lane, it supersedes any prior agreement as to the fence.

As to matter of law : The limitation act of the 26th March 1785, (2 Dall. St. Laws 282) bars the right of entry or recovery on any prior warrant, whereon no survey has been made, and on any prior settlement, improvement or occupation without other title, unless there has been a possession within seven years next before the bringing of the suit.

To this it may be answered, that the caveat and decision of the two land officers, amount to other title. But a ready reply occurs, that their decision is merely an order of survey, and the authority not being pursued, is of no avail. Considered by itself, it vests no interest; united with an ancient occupation, long neglected and abandoned, it confers no right or title.

Admitting however, the pretensions of the lessor of the plaintiff in their fullest extent, that the fence was the original boundary, which was never altered by consent, and that the limitation act is no legal bar, still the abandonment of the improvement, and the supine negligence of Thomas for so great a length of time as thirty-six years, living at no great distance from the land, interpose insuperable obstacles to his demand.

If in England, a long possession without a deed, (2 Inst. 118, 362) is preferable to an ancient deed without possession, the rule holds with much greater force in new countries, where the community are peculiarly interested in the cultivation of the soil, and man ual labor so much enhances the value of real property. Such are

the grounds of policy in the law referred to, and such have been the uniform decisions of courts of justice, to prevent litigations on slight pretensions, and give security to landed titles.

Verdict for the defendant.

Messrs. Duncan, Hopkins and Elder, *pro quer.*

Messrs. Montgomery and Fisher, *pro def.*